**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUNVESTMENT ENERGY GROUP NY 64 LLC, SARANAC LAKE COMMUNITY SOLAR, LLC, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL GRID USA SERVICES CO., INC. and NIAGARA MOHAWK POWER CORPORATION, <br><br> Defendants. | **Case No.**  5:22-cv-1085 (BKS/TWD) <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ACTION.................................................................1

PARTIES .......................................................................................................................................5

JURISDICTION AND VENUE.....................................................................................................7

CLASS ALLEGATIONS ...............................................................................................................7

FACTS..........................................................................................................................................10

      A.  Utilities Are Deliberately Undermining Public Policies Supporting
           Distributed Generation of Renewable Energy.......................................................10

      B.  In Violation of Public Policy, National Grid Has Acted Broadly to Obstruct
           Independent Renewable Energy Generators........................................................14

      C.  National Grid Charged Improper Pass-Through Taxes to Interconnect
           Plaintiffs' Renewable Energy Projects ................................................................16

      D.  Despite the Fact That Its Own Consultant's Tax Opinion Found
           Plaintiffs' Position "Compelling," and Contrary to the Opinion
           of Its Own Director of    U.S. Tax Research and Planning, National
           Grid Insisted That the Tax Was Owed ................................................................18

      E.  State Public Utility Commissions and State Courts Are Unable to Resolve
           This Dispute...........................................................................................................23

CAUSES OF ACTION..................................................................................................................26

      I.     DECLARATORY JUDGMENT ...........................................................................26

      II.    BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING ..........27

      III.  RESTITUTION AND UNJUST ENRICHMENT................................................28

      IV.  JUST AND REASONABLE CHARGES..............................................................30

PRAYER FOR RELIEF ...............................................................................................................31

DEMAND FOR JURY TRIAL ....................................................................................................31

**INTRODUCTION AND SUMMARY OF THE ACTION**

1.      Plaintiffs Sunvestment Energy Group NY 64 LLC and Saranac Lake Community Solar, LLC ("Plaintiffs") are independent renewable energy generators.  They bring this action on their own behalf and on behalf of a similarly situated class ("Plaintiffs" or the "Plaintiff Class").

2.      Defendants National Grid USA Services Co., Inc. and Niagara Mohawk Power Corporation d/b/a National Grid ("Defendants" or "National Grid") are subsidiaries of National Grid plc, one of the world's largest electric and gas utilities.  National Grid transmits and distributes electricity through a power grid that it maintains.

3.      Pursuant to the New York State Standardized Contract for Interconnection of New Distributed Generation Units ("SCI"),[1] National Grid connects Plaintiffs' projects with the grid and subsequently purchases electricity generated by them.

4.      Defendants compete with Plaintiffs, and concededly have an interest in increasing their costs.  In furtherance of that interest, Defendants wrongfully passed through to Plaintiffs and the Plaintiff Class a charge related to a purported federal tax that was not actually owed.

5.      Under applicable law and tariffs and the SCIs that Plaintiffs signed, they are required to pay National Grid for any upgrades or modifications to the power grid that are necessary to interconnect their projects, and that thereafter become the property of National Grid. Such modifications might include new power lines, substations, or other upgrades to National Grid's systems to enable it to accept additional electricity.  The interconnections are commonly referred to as "interties."

---

[1] *See* New York State Standardized Interconnection Requirements and Application Process for New Distributed Generators and/or Energy Storage Systems 5 MW or Less Connected in Parallel with Utility Distribution Systems, App.      A,      N.Y.      Pub.      Serv.      Comm'n,      (2022), https://www3.dps.ny.gov/W/PSCWeb.nsf/96f0fec0b45a3c6485257688006a701a/dcf68efca391ad6085257687006f3 96b/$FILE/May%202022%20SIR%20-%20FInal%20-%20DMM.pdf.

1

6.      National Grid claims that it must pay income tax on these interconnection payments.  It therefore passes through to Plaintiffs an amount purportedly necessary to make it whole.  This charge, referred to as a "tax gross-up adder" or "tax gross-up," is equal to the purported income tax minus National Grid's tax savings from depreciating the newly acquired assets.

7.      In fact, the text of 26 U.S.C. § 118 and applicable Internal Revenue Service ("IRS") Notices make plain that no tax is owed on Plaintiffs' interconnection payments:   in contradistinction to "contributions in aid of construction" or "CIACs," which are income to the utility and therefore taxable, these payments to the utility are contributions to its capital, and as such are tax exempt.

8.      Congress and the IRS have explained the distinction:  CIACs are interconnection payments that are advance payments for service by customers who will purchase electricity from a utility.  In contrast, the independent renewable energy generators are not purchasers of electricity, but rather suppliers.  Their payments for interconnection enable the utility to purchase power from them.  Because their interconnection payments are not advance payments for future service, they do not constitute taxable income to the utility.

9.      In Notices issued in 1988 and subsequently, the IRS defined a safe harbor that distinguishes payments by customers, which are taxable as income, from contributions by independent generators, which are not.  Plaintiffs are within that safe harbor.

10.      In the face of overwhelming evidence to the contrary, National Grid nevertheless insists that the tax status of Plaintiffs' interconnection payments is ambiguous and further that because the IRS might treat these payments as CIACS, it must pay the tax.  It does so even in the face of the repeatedly stated opinions of its own Director of U.S. Tax Research and Planning and

its own Senior Counsel that the tax is not owed and the opinion of its own consultant, Ernst & Young, LLP, that a "compelling" case can be made that it is not owed.

11.     National Grid could simply not pay this tax, without risking any penalty—or it could pay it and seek a refund.  Unlike any other rational taxpayer, it has done neither.  That is not only because National Grid does not bear the economic burden of the tax, but also because it has an active interest in increasing the interconnection costs of independent generators by passing the burden through to them.

12.     National Grid, like other electric utility companies, has ownership interests in competing power generation, both from renewables and from traditional sources.  Independent renewable energy generators also threaten utilities' ability to recoup from ratepayers their past investments in generating plants.  As detailed below, utilities therefore view independent generators as contributing to what industry observers have described as a potential "utility death spiral."

13.     In 2013, the Edison Electric Institute, the industry association for investor-owned electric utilities, explicitly suggested that the industry take self-protective measures lest it follow Kodak and the land-line telephone companies into oblivion.  Specifically, the Edison Electric Institute suggested that utilities take steps to disincentivize independent generation by imposing greater costs on it.

14.     National Grid's actions thwart federal and state policies promoting the development of distributed energy resources ("DERs") to address climate change and provide more secure, cheaper, and cleaner local electricity to consumers.

15.     Since 2014, independent generators in Rhode Island and Massachusetts have unavailingly sought to raise the question of the legality of the tax gross-up before their respective

public utility commissions and, in the case of Rhode Island, in a proceeding begun before the Rhode Island Public Utilities Commission ("RIPUC") and appealed to the Rhode Island Supreme Court.   In both states, the utilities contended that the commissions and state courts lacked jurisdiction to answer the question.   In both states, the challenges were rebuffed without resolution on the merits.

16.      On August 2, 2021, Plaintiffs herein filed a class action in the District Court for the District of Rhode Island, together with similarly injured Rhode Island and Massachusetts plaintiffs, making the same claims that they now make here, against these same Defendants and against the Rhode Island and Massachusetts subsidiaries of National Grid, *i.e.*, Narragansett Electric Company ("Narragansett Electric"),[2] Massachusetts Electric Company, and Nantucket Electric Company. By Stipulation and Order so ordered on October 12, 2022,[3] the District Court of Rhode Island dismissed without prejudice the claims of the non-Rhode Island plaintiffs, with tolling agreements contemplating that those same claims would be refiled in federal district court in their respective states of residence.   This Complaint is the New York Plaintiffs' refiling.

17.      Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that their payments to National Grid for modifications of the power grid are not taxable as income to National Grid.   Defendants' unlawful charges give rise to Plaintiffs' further claims for breach of the covenant of good faith and fair dealing, restitution, and violation of New York Public Service Law § 65, which requires just and reasonable rates.

---

[2] On May 25, 2022, National Grid announced that it had completed the sale of Narragansett Electric to PPL Rhode Island Holdings, LLC.

[3] *ACP Land LLC v. National Grid plc*, No. 21-316, Doc. No. 25 (D.R.I. filed Aug. 2, 2022), https://ecf.rid.uscourts.gov/doc1/16112028853?caseid=51922&de_seq_num=157&magic_num=5339410.

## PARTIES

18.     Plaintiff Sunvestment Energy Group NY 64 LLC ("Sunvestment") is a New York limited liability company with a business address at 4700 Pottsville Pike, Reading, Pennsylvania. On June 14, 2018, Sunvestment signed an SCI with Niagara Mohawk Power Corporation d/b/a National Grid to operate a 4.06-megawatt solar project located at 5563 Lakeville Road, Geneseo, New York.  The SCI was signed by Niagara Mohawk on August 19, 2019.  On December 27, 2019, National Grid invoiced Sunvestment $315,931, including an "Income Tax Liability" amount of $17,556.76, for upgrades to interconnect the project.  The invoice was paid on July 24, 2019.

19.     Plaintiff Saranac Lake Community Solar, LLC ("Saranac") is a New York limited liability company headquartered at 125 Tech Park Drive, Rochester, NY 14623.  On August 2, 2017, Sunvestment Group LLC, a member of Saranac, signed an SCI with National Grid on behalf of Saranac to operate a 2.06-megawatt solar project located at 2089 State Rte. 86, Saranac Lake, New York.  The SCI was signed by Niagara Mohawk on February 19, 2019.  On July 26, 2019, National Grid sent Saranac an invoice for $336,390, including an "Income Tax Liability" amount of $40,000.47, for upgrades to interconnect the project.  Saranac paid the tax on July 24, 2019.

20.     Both Plaintiffs meet all applicable conditions for the safe harbor set forth in IRS Notices 88-129 and 2016-36.  Most relevant here is the "5% test," which requires an expectation that "during the ten taxable years of the utility beginning with the year in which the contributed intertie is placed in service, no more than 5% of the projected total power flows over the intertie will flow to the generator."[4]  In other words, 95% of the power is projected to flow <u>from</u> the generator <u>to</u> the utility.

_____

[4] Notice 2016-36, 2016 IRB LEXIS 383 (I.R.S. June 10, 2016).

21.     Defendants National Grid USA Services Co., Inc. ("ServCo") and Niagara Mohawk Power Corporation ("Niagara Mohawk") are subsidiaries of National Grid USA, Inc., which is in turn a subsidiary of National Grid North America, Inc. and National Grid plc, the UK parent company.  National Grid plc describes itself on its website as "one of the world's largest publicly listed utilities focused on transmission and distribution of electricity and gas."[5]  National Grid USA, Inc. has approximately 45 subsidiaries.[6]  In 2021/22, it reported U.S. revenue of £10.7 billion, or $12.1 billion and pre-tax profits of almost £1.4 billion, or $1.6 billion.[7]  National Grid subsidiaries operate as a single utility company under the name "National Grid."

22.     Niagara Mohawk is a New York corporation with headquarters at 300 Erie Blvd. West, Syracuse, New York 13202 and offices at 80 State Street, Albany, New York 12207.  It is engaged in the regulated energy delivery business, providing electric service to approximately 1.7 million customers in eastern, central, northern, and western New York, and natural gas service to approximately 600,000 customers in central, northern, and eastern New York.

23.     ServCo. is a Massachusetts corporation with its principal place of business in Waltham, Massachusetts.  Among other services, it provides administrative and support services, including tax policy advice and tax accounting services, to the subsidiaries of National Grid USA, including Niagara Mohawk.  In 2020, ServCo provided $495,877,943.52 in services to Niagara Mohawk.[8]

---

[5] *See* https://www.nationalgrid.com/.

[6] *See* National Grid, Responses to Rhode Island Public Utilities Commission's Second Set of Data Requests, 4-10 (2021), https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/D_21_09_DR_NGrid_2_Part_2.pdf.

[7] National Grid, Bring Energy to Life, Annual Report and Accounts 2021/22, 47 (2022), https://www.nationalgrid.com/document/146731/download.

[8] *See supra* n.6, at 10.

24.     ServCo has a U.S. Tax Department that sets tax policies for the National Grid operating companies.  ServCo employee Robert Ermanski, whose title is or was at all relevant times "Director, U.S. Tax Research & Planning, National Grid," was a key player in the wrongful charging of the tax gross-up adder.  He communicated with the IRS and with National Grid consultant Ernst & Young regarding this issue, prepared or oversaw the preparation of the responses of National Grid's Rhode Island subsidiary, Narragansett Electric, to RIPUC's questions regarding this issue, and was identified as a contact person in connection with National Grid's request for a Private Letter Ruling ("PLR") regarding the application of the safe harbor to a Rhode Island renewable energy project.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1367.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that one of the Defendants resides here and a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## CLASS ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all individuals or entities residing or located in New York who entered into SCIs—mandatory standardized form agreements—with Niagara Mohawk, whose projects meet the requirements of the IRS's safe harbor, and whom Defendants wrongfully charged a tax gross-up that was not owed.

28.     Specifically excluded from the class are: (i) Defendants and any entities in which Defendants had or have a controlling interest; (ii) Defendants' officers and directors, any members

of their immediate families, and their legal representatives, heirs, successors, or assignees; and (iii) any of Defendants' employees.

29.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

30.     All of Rule 23's requirements for class certification are satisfied.

31.     **Numerosity:**  The class is so numerous that joinder of its members is impracticable. While the precise number of members within the class is unknown at this time and can only be definitively ascertained through appropriate discovery, Plaintiffs believe that the class is, at a minimum, comprised of several hundred class members.

32.     Contributions to National Grid's capital by an independent generator qualify for the safe harbor provided that the generator meets certain conditions.  Most relevant here, 95 percent of the total power flows over the interconnection must flow from the generator to the utility.  A 40-kilowatt project is of a size such that it is very likely to meet this condition.  Data on National Grid's website and on the website of the New York State Department of Public Service reveal that there have been hundreds of registered interconnection projects of this size in the class.

33.     **Typicality**:  Plaintiffs' claims are typical of the claims of the absent class members. Like all class members, Plaintiffs entered into SCI agreements with Defendants and were injured by the same misconduct, *i.e.*, Defendants' wrongful imposition of a tax gross-up for a tax that National Grid did not owe.

34.     **Adequacy**:  Plaintiffs will fairly and adequately represent and protect the interests of the members of the class.  They do not have any interests that are contrary to, or in conflict with, the interests of the members of the class they seek to represent.  Plaintiffs have retained counsel

that are competent and experienced in complex class action litigation and have sufficient resources to prosecute this action vigorously.

35.   **Commonality and Predominance**:  Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual class members.  The questions of law and fact common to all class members include:

a.   Whether, under the Internal Revenue Code, the interconnection charges by the independent renewable energy generators comprising the class are taxable to National Grid as CIACs;

b.   Whether National Grid paid tax on amounts paid by Plaintiffs to National Grid;

c.   Whether National Grid violated the covenant of good faith and fair dealing when it charged Plaintiffs the tax gross-up;

d.   Whether Plaintiffs and the class are owed restitution and/or damages as a result of Defendants' unlawful assessment of the tax gross-up;

e.   Whether Plaintiffs and the class are entitled to injunctive relief and if so, the nature and extent of such injunctive relief.

36.   **Superiority**:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the class is impracticable.  Furthermore, as the damages suffered by the individual members of the class may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually seek redress for the wrongs done to them.  The prosecution of separate actions by individual members of the class would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants.  There will be no difficulty in the management of this action as a class action.

37.     The class, as defined above, should be certified under Fed. R. Civ. P. 23(b)(1) as all requisite elements of that section are met.  Class certification will avoid inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

38.     The class, as defined above, should also be certified under Fed. R. Civ. P. 23(b)(2) as all requisite elements of that section are met.  Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the class on all counts.

## FACTS

### A.     Utilities Are Deliberately Undermining Public Policies Supporting Distributed Generation of Renewable Energy

39.     The United States Federal Government has enacted laws, adopted policies, and appropriated billions of dollars to bolster a clean energy economy.  The Energy Policy Act of 2005 created the Solar Investment Tax Credit ("ITC"), which provides a tax incentive for solar developments sited on residential and commercial properties.[9]  The American Recovery and Reinvestment Act of 2009 provided over $90 billion in strategic clean energy investments and tax credits.[10]  The Inflation Reduction Act of 2022 provided over $370 billion in subsidies and tax incentives to promote energy security and address climate change.[11]  Numerous executive orders have further advanced efforts to "build a clean energy economy that will sustain our prosperity and the health of our people and our environment for generations to come."[12]

---

[9] Energy Policy Act of 2005, Pub. L. No. 109-58, § 1337, 119 Stat. 1038 (2005).

[10] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 138-140 (2009).

[11] Pub. L. No. 117-169 (2022), https://www.congress.gov/bill/117th-congress/house-bill/5376/text.

[12] Exec. Order No. 13693, 80 Fed. Reg. 15871 (Mar. 19, 2015), https://www.govinfo.gov/content/pkg/FR-2015-03-25/pdf/2015-07016.pdf ; *see also* Exec. Order on the Implementation of the Energy and Infrastructure Provisions of

40.     New York State policies incentivized the rapid deployment of DERs in parallel with Federal efforts.  New York has acted with urgency.  In 2014, New York State launched "Reforming the Energy Vision" ("REV"), a set of multi-year regulatory proceedings and policy initiatives intended to transform the way electricity is produced, bought, and sold in New York.  A primary goal of REV is to make it easier for New York consumers and utilities to invest in DERs, providing "new opportunities for energy savings, local power generation, and enhanced reliability to provide safe, clean, and affordable electric service."[13]

41.     In 2019, New York enacted the New York State Climate Leadership and Community Protection Act.  Section 4 of that statute required the Public Service Commission to "establish a program to require that . . . a minimum of seventy percent of the state wide electric generation . . . to meet the electrical energy requirements of all end-use customers in New York state in two thousand thirty shall be generated by renewable energy systems."[14]  The statute further provided that "the New York state energy research and development authority shall consider enhanced incentive payments for solar and community distributed generation projects."[15]  New York also adopted regulations to create more precise price signals to incentivize further deployment of DER.[16]

42.     The investor-owned electric utilities perceive these federal and state policies as a threat to their profitability and indeed, to their very survival.  In January 2013, the Edison Electric

---

the Inflation Reduction Act of 2022, https://www.whitehouse.gov/briefing-room/presidential-actions/2022/09/12/executive-order-on-the-implementation-of-the-energy-and-infrastructure-provisions-of-the-inflation-reduction-act-of-2022/.

[13] *Reforming the Energy Vision*, New York State Dep't of Public Service, (2022), https://www3.dps.ny.gov/w/pscweb.nsf/all/cc4f2efa3a23551585257dea007dcfe2.

[14] N.Y. Climate Leadership and Community. Protection. Act, N.Y. Pub. Serv. L. § 66-p (2), (June 18, 2019).

[15] *Id.* § 66-p (7)(b).

[16] *See In the Matter of the Value of Distributed Energy Resources*, No. 15-E-0751, 2017 WL 976518 (N.Y. Pub. Serv. Comm'n Mar. 9, 2017).

Institute, the industry association for investor-owned electric utilities, published a report titled "Disruptive Challenges" ("Report").[17]   The Report considered "the financial risks and investor implications related to disruptive challenges" from technological innovations, especially the dramatic decline in the cost of solar panels.[18]   The Report warned that these "disruptive technologies . . . compete with utility-provided services."[19]   As more and more households and businesses reduce or even eliminate their dependency on the grid, the Report continued, the viability of electric utilities is threatened.   These threats are increased by public policies to promote renewable energy.[20]

43.     The Report concluded that "[t]he threats posed to the electric utility industry from disruptive forces, particularly distributed resources, have serious long-term implications for the traditional electric utility business model and investor opportunities."[21]   Comparing the situation of electric utility companies to that of land-line telephone companies at the advent of cable and cell phone technologies, the Report urged them to "prepare for and develop plans to address disruptive threats."[22]   They needed to react urgently, the Report said, in order "to survive and to protect investors from a 'Kodak moment.'"[23]

44.     To this end, the Edison Electric Institute recommended that the utility industry take steps to slow or impede the spread of DER.   Most relevant here, the Report recommended that

---

[17] Peter Kind, *Disruptive Challenges: Financial Implications and Strategic Responses to a Changing Retail Electric Business*, Edison Electric Institute (2013), https://www.ourenergypolicy.org/wp-content/uploads/2013/09/disruptivechallenges-1.pdf.

[18] *Id*. at 1.

[19] *Id*. at 3.

[20] *Id*. at 4-5.

[21] *Id*. at 17.

[22] *Id*. at 6.

[23] *Id*. at 16.

utilities "[c]onsider a customer advance in aid of construction in all states to recover upfront the cost of adding new customers and, thus, mitigate future stranded cost risk."[24]  It also recommended that utilities "develop profit streams to counterbalance the impact of disruptive forces.  Examples of new profit sources would include ownership of distributed resources with the receipt of an ongoing service fee . . . ."[25]

45.     Utility companies heard the alarm sounded by the Edison Electric Institute.  They responded by changing rate structures and placing other barriers in the way of DER and by entering into the DER market as competitors themselves, through subsidiaries and affiliates.  These responses have raised serious antitrust concerns.[26]

46.     These utility company tactics are not only contrary to the public policy of supporting distributed renewable energy, but also contrary to the most basic premise of public regulation of this natural monopoly.  Rate regulation serves

> as a substitute for competition in the business of electricity distribution.  The foundational legal premise for this arrangement is that the IOU [(investor-owned utility)] "was created for public purposes [and] performs a function of the state."  As an instrument of the state, it has unique authorities, such as the power to exercise eminent domain.  In turn, the government has a responsibility to "protect the people against unreasonable charges for services rendered by [the IOU]."
>
> The rate-setting process is thus the core of government oversight.  IOU rates are designed to compensate the utility for the costs it incurs to serve the public, plus a reasonable rate of return on its capital investments in power plants, transmission and distribution lines, and other infrastructure. . . . Tying consumer

---

[24] *Id*. at 18.

[25] *Id*.

[26] M.W. Wara, *Competition at the Grid Edge:  Innovation and Antitrust Law in the Electricity Sector*, 25 N.Y.U. Envtl. L.J., 179, 180 (2017) (describing "utility death spiral" and industry reaction to Edison Electric Institute study); *see also* A. Peskoe, *Unjust, Unreasonable, and Unduly Discriminatory:  Electric Utility Rates and the Campaign Against Rooftop Solar*, 11 Tex. J. of Oil, Gas, and Energy L. (2016).

rates to utility costs is . . . intended to ensure that IOUs do not earn exorbitant profits . . . .[27]

**B.    In Violation of Public Policy, National Grid Has Acted Broadly to Obstruct Independent Renewable Energy Generators**

47.    Like other investor-owned utilities, National Grid has an interest in raising the costs of independent renewable energy generators.  National Grid Ventures, a non-regulated unit of National Grid, competes with Plaintiffs in the development, construction, and operation of renewable energy projects.  Together with Ørsted and Eversource, National Grid Ventures is developing a 704 MW wind farm south of the Rhode Island and Massachusetts coasts, expected to be operational by 2023, that will supply electricity in Rhode Island and Connecticut.[28]

48.    On July 15, 2019, National Grid Ventures completed a $100 million acquisition of Geronimo Energy, a leading solar and wind developer in North America.[29]

49.    On October 14, 2020, National Grid Ventures announced the launch of National Grid Renewables, which encompasses Geronimo Energy and "develops, owns and operates renewable energy assets across the United States – including solar, onshore wind and battery energy storage. "[30]

50.    National Grid also owns and controls major interests in natural gas transmission and storage.  Natural gas is the largest source of energy for the generation of electric power in the United States, and competes with DERs.

---

[27] Peskoe, *supra* n. 26, at 111 (quoting *Smyth v. Ames*, 169 U.S. 466, 544-45 (1898)).

[28]    *See* National Grid, *Future Developments*, https://www.nationalgrid.com/our-businesses/national-grid-ventures/what-we-do/future-developments.

[29]    *See* National Grid, *National Grid Completes Acquisition of Geronimo Energy* (July 15, 2019), https://www.nationalgrid.com/stories/grid-at-work/national-grid-completes-acquisition-geronimo-energy.

[30]    *See* National Grid, *Introducing National Grid Renewables* (Oct. 14, 2020), https://www.nationalgrid.com/stories/journey-to-net-zero-stories/introducing-national-grid-renewables.

51.     In addition to its wrongful charge of a tax gross-up in those states in which National Grid operates (New York, Massachusetts, and until last May, Rhode Island), described further below, National Grid has also sought to impede the development of DER in other ways.

52.     In Massachusetts, the Department of Public Utilities ("DPU") launched an investigation of National Grid's management of its interconnection process on the ground that actions by the company were likely "to delay the interconnection of affected [solar] projects, which total over 900 MW . . . or more than half of the Commonwealth's target for solar development . . . . Based on the record evidence, the delay could be years depending on the length of the study and the time needed to implement any necessary system upgrades."[31]

53.     In Rhode Island, National Grid proposed to assess local renewable energy projects an "access fee" based on an allegation that such projects burden the electrical system in ways that are subsidized by other customers.[32]   In response to opposition from the renewable energy development community and environmental advocates, National Grid withdrew its proposal.

54.     Also in Rhode Island, in violation of the State's Standards for Connecting Distributed Generation, National Grid had a practice of overestimating interconnection costs for prepayment and then not trueing up to actual costs unless a customer requested an audit.   In two cases known to Plaintiffs' counsel, estimates exceeded actual costs by 65 percent.  On November 12, 2014, RIPUC issued an order requiring National Grid to true up to actual costs.[33]

---

[31] Mass. D.P.U. Order No. 18-150, 2019 MASS. PUC LEXIS 264, at *596-97 (Mass. D.P.U. Sept. 30, 2019); *see also* R. Walton, *Alleged National Grid Management Problems at 'the Highest Levels' Prompt Massachusetts Investigation*, UtilityDive (Oct. 14, 2019), https://www.utilitydive.com/news/alleged-national-grid-management-problems-at-the-highest-levels-prompt-ma/564938/.

[32] Motion for Summary Disposition by Green Development, LLC d/b/a Wind Energy Development, LLC., at 2 (RIPUC Dkt. No. 4568, Sept. 29, 2015), http://www.ripuc.ri.gov/eventsactions/docket/4568-WED-SummaryDisposition.pdf.

[33] *See* Memorandum and Summary of Interim Orders (RIPUC Dkt. No. 4483, Nov. 12, 2014), http://www.ripuc.ri.gov/eventsactions/docket/4483-PUC-Interim-Order-Summary(11-12-14).pdf.

## C.     National Grid Charged Improper Pass-Through Taxes to Interconnect Plaintiffs' Renewable Energy Projects

55.     Under the SCIs that National Grid signed with each Plaintiff and each member of the Plaintiff Class, Plaintiffs must pay all interconnection costs.  Among those costs, National Grid included the pass-through of purported federal taxes that National Grid did not in fact owe.

56.     Section 61 of the Internal Revenue Code defines gross income as income from any source.  26 U.S.C. § 61(a).

57.     Prior to the Tax Reform Act of 1986, 26 U.S.C. § 118, titled "Contributions to the capital of a corporation," provided that customers' payments to public utilities for system improvements necessary to connect them to the grid be treated as contributions to capital that were not taxable as income.

58.     The Tax Reform Act amended 26 U.S.C. § 118 to add a new subsection (b) (now subsection (b)(1)), making such contributions taxable.  Section 118 now provides, in relevant part:

(a) **General rule**. In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

(b) **Exceptions**. For purposes of subsection (a), the term "contribution to the capital of the taxpayer" does not include—

(1)  any contribution in aid of construction [CIAC] or any other contribution <u>as a customer or potential customer</u>, . . .

26 U.S.C. § 118 (a)-(b)(1) (emphasis added).[34]

59.     Congress' Joint Committee on Taxation explained that the 1986 amendment was enacted because "[t]he Congress believed that all payments that are made to a utility either to

---

[34] In 2017, pursuant to the Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2132, (2017) the last 16 words of §118(b)—"any contribution in aid of construction or any other contribution as a customer or potential customer"— were redesignated §118(b)(1), and a new paragraph (b)(2) was added.  This change has no bearing on the present dispute.

encourage, or as a prerequisite for, the provision of services should be treated as income of the utility and not as a contribution to the capital of the utility."[35]

60.     The statute and its legislative history thus state explicitly that CIACs are taxable because they are payments made by <u>customers</u> to enable utility service.  In effect, they are advance payments for service.  Independent generators, however, are not customers, *i.e.*, purchasers of electricity <u>from</u> the utility, but rather sellers of electricity <u>to</u> the utility.

61.     In 1988, the IRS issued guidance that outlined the parameters of a safe harbor, specifically distinguishing payments by customers, which are taxable as income, from contributions by independent generators, which are not:

> In a CIAC transaction the purpose of the contribution of property to the utility is to facilitate the sale of power by the utility to a customer.  In contrast, the purpose of the contribution by a Qualifying Facility[[36]] to a utility is to permit the sale of power by the Qualifying Facility to the utility.  Accordingly, the fact that the 1986 amendments to Code section 118(b) render CIAC transactions taxable to the utility does not require a similar conclusion with respect to transfers from Qualifying Facilities to utilities.

Notice 88-129, 1988 IRB LEXIS 3720, at *2-3 (I.R.S. July 1, 1988).  Because payments by independent generators are in furtherance of power purchases by the utility, not sales, they are not taxable income to it.

62.     Subsequent IRS notices expanded eligibility for the safe harbor.[37]  Notice 2016-36 superseded and expanded on the prior notices.  Rejecting the distinction that National Grid seeks to make between generators that connect to the long distance, high-voltage transmission system

---

[35] General Explanation of the Tax Reform Act of 1986, Pub. L. No. 99-514, H.R. 99-3838, at 544 (May 4, 1987), https://www.jct.gov/publications/1987/jcs-10-87/.

[36] A "Qualifying Facility" is a small power producer or cogenerator as defined in the Federal Power Act (16 U.S.C. § 796 (17)(C), (18)(B)), as amended by section 201 of the Public Utilities Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3134.

[37] *See* Notice 90-60, 1990 IRB LEXIS 425 (I.R.S. July 1, 1990); Notice 2001-82, 2001 IRB LEXIS 450 (I.R.S. Dec. 26, 2001); Notice 2016-36, 2016 IRB LEXIS 383 (I.R.S. June 10, 2016).

and those that connect to the local, low voltage distribution system, the Notice stated that "a generator (such as a solar or wind farm) may contribute an intertie to a utility that qualifies under the new safe harbor even if the generator is interconnected with a distribution system, rather than a transmission system."[38]

63.     Notice 2016-36 further stated that "[t]he Treasury Department and the Internal Revenue Service (IRS) believe that these modifications will promote reliability and economic efficiency throughout the grid and the development and interconnection of renewable energy resources."[39]

D.     **Despite the Fact That Its Own Consultant's Tax Opinion Found Plaintiffs' Position "Compelling," and Contrary to the Opinion of Its Own Director of U.S. Tax Research and Planning, National Grid Insisted That the Tax Was Owed**

64.     Notwithstanding that both the Internal Revenue Code and authoritative IRS guidance, *i.e.*, Notices 88-129 and 2016-36, provide that payments for system upgrades by independent renewable energy generators are not income to the utility, National Grid has seized on a technicality to argue that the interconnection payments are taxable income. Specifically, National Grid argues that because Notice 88-129 used the words "transmission facilities" and "transmission network," the safe harbor does not extend to independent generation projects such as those of Plaintiffs, which connect to the distribution network rather than the transmission network.

65.     The distinction is that the transmission network carries electricity over long distances through high-voltage wires whereas the distribution network carries that same power to end users over smaller wires at lower and safer voltages.

---

[38] Notice 2016-36, *supra* n. 37, at *14.

[39] *Id.*

66.     Nothing in the rationale underlying the safe harbor of Notice 88-129 supports National Grid's contention that the difference between transmission and distribution is in any way relevant to whether such contributions are or are not taxable as income to the utility.

67.     Indeed, National Grid itself does not believe that this distinction is relevant or that interconnection payments are taxable income to it.  In communications to the IRS and to RIPUC on behalf of National Grid, its Director of U.S. Tax Research and Planning, Robert A. Ermanski, and its Senior Counsel Raquel J. Webster, both asserted that Plaintiffs' interpretation of the Internal Revenue Code was correct.

68.     In a September 12, 2014 letter signed by Senior Counsel Webster to RIPUC, National Grid observed that the reason Notice 88-129 referred to interconnections to a "transmission network" and did not mention distribution was because "[a]t the time IRS issued Notice 88-129, it was typical for such generators to interconnect directly to the utility system at transmission voltage."[40]  National Grid explained that although that was no longer the case, "the IRS guidance continued to refer to 'transmission interties.'"[41]  In other words, according to National Grid itself, the omission of "distribution" was a historical artifact of no substantive importance.

69.     In that same letter, National Grid recognized that 26 U.S.C. § 118(b)'s exception of contributions in aid of construction from the tax exemption for contributions to capital created by § 118(a) was intended to apply to "customers taking traditional utility service[,]" because their "payments made to utilities as reimbursement for the cost of constructing such interconnections

---

[40] Letter from National Grid Senior Counsel R.J. Webster to L.E. Massaro, Commission Clerk, Sept. 12, 2014, at 2-3 (RIPUC Dkt. No. 4483), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-LetterProposal(9-12-14).pdf.
[41] *Id*. at 3.

are viewed as prepayments for future utility services."[42]   Whereas such prepayments are income

to the utility and therefore taxable, "payments . . . not related to utility services . . . should not be

taxed."[43]

70.     While admitting that the distinction between transmission and distribution was

irrelevant, National Grid also acknowledged that because it passes the tax through to Plaintiffs, it

"has no financial incentive to seek a PLR"[44] – or indeed to ascertain in any way whether the tax is

owed or not.

71.     National Grid did not acknowledge, however, that it actually has a financial

incentive not to seek a Private Letter Ruling, so as to jack up the costs of independent generators.

72.     Some 22 months later, on June 28, 2016, Robert A. Ermanski, National Grid's

Director of U.S. Tax Research and Planning, e-mailed David A. Selig, the IRS attorney who was

the "principal author" of Notice 2016-36, to state Ermanski's understanding that it was the IRS's

position, as well as his own, that payments for interconnection to the distribution system were

within the safe harbor.   Memorializing a recent phone call with Mr. Selig, Ermanski wrote:

"During the call, you confirmed that Notice 2016-36 was indeed intended to cover transactions of

this type," *i.e.*, payments for connection with a distribution system even where the power never

passes to a transmission system.[45]   Ermanski continued:

> [T]he continued use of the restrictive term "transmission" in Section IIIB and
> IIIC of Notice 2016-36 may cause taxpayers to conclude incorrectly that the new
> safe harbor is only permitted when electricity which passes through a
> "distribution" system intertie is ultimately delivered to the utility's

---

[42] *Id*. at 2.

[43] *Id.*

[44] *Id.* at 3.

[45] National Grid letter to L.E. Massaro, Commission Clerk, Oct. 13, 2016, Attachment B, June 28, 2016 e-mail from Ermanski to IRS Counsel, David Selig, at 1 (RIPUC Dkt. No. 4483) http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-Update-PLRCompliance(10-13-16).pdf.

"transmission" system.  National Grid urges IRS to provide written clear written guidance indicating that:

- The definition of "Intertie" in Section IIIB includes interconnections with "distribution" systems.

- The ownership requirement of Section III(C)(2) also applies to electricity passing through an "Intertie" which is then distributed via a "distribution" system rather than wheeled or transmitted via a "transmission" system

- The requirement of Section III(B)(4) is satisfied if the "Intertie" is used to distribute rather than transmit electricity[.][46]

73.     The Edison Electric Institute took the same position.  In a September 13, 2016 letter to IRS Attorney David Selig, it stated that it "assume[d] your intent was to provide the same treatment for all transfers of an intertie to a distribution utility as is provided to transfers of intertie property to transmission utilities."[47]  The Institute further recognized that requiring tax gross-ups "is contrary to the tax policy the Service is implementing in the Notice."[48]

74.     If it wished to do so, National Grid could easily determine whether the tax is owed, either by not paying it or by paying it and then seeking a refund.  In taking the former course, it would not risk incurring a tax penalty, because there is "substantial authority" for the position that the tax is not owed.

75.     "Substantial authority" is a term of art, defined in Treas. Reg. § 1.6662-4(d). Positions supported by substantial authority are effectively immune from the accuracy-related penalty under 26 U.S.C. § 6662(b).  Treasury regulations are specific about how to go about evaluating whether a tax position is supported by substantial authority, and make clear that a position can be supported by substantial authority even if it is probably wrong.  Practitioners have

---

[46] Id. (emphasis added).

[47] Id., Attachment C, Edison Electric Institute Sept. 13, 2016 letter to IRS Counsel, David Selig, at 2.

[48] Id. at 7.

ballparked "substantial authority" as meaning that the position has a 35 to 40 percent chance of being correct.

76.     There is substantial authority—authority from sources explicitly recognized by the regulations as authoritative—for the position that National Grid does not owe the tax at issue here: the text of 26 U.S.C. § 118 itself, congressional committee reports, publications of the Joint Committee on Taxation, IRS Notices, and PLRs.

77.     National Grid's bad faith is evidenced by the fact that on September 12, 2014, when it proposed to settle its dispute with independent generators in Rhode Island by seeking PLRs from the IRS, it agreed that "[i]f the PLRs provide a <u>reasonable basis</u> to conclude that the tax exemption applies to projects interconnected to electric distribution facilities, the Company will recommend [to RIPUC] that it . . . no longer collect the tax from the eligible projects."[49]

78.     Like "substantial authority," "reasonable basis" is a term of art, defined by Treas. Reg. § 1.6662-3(b)(3).  It is a low threshold, which practitioners have quantified as between 10 and 25 percent likely correct.

79.     Given this low threshold, National Grid's continued levy of the tax gross-up after the issuance of Notice 2016-36, and even in the face of the contrary statements by its own Director of U.S. Tax Research and Planning and its own Senior Counsel, was improper and in bad faith.

80.     After the issuance of Notice 2016-36, National Grid commissioned an opinion from Ernst & Young, LLP.  After a strained, result-oriented, and fundamentally flawed analysis, Ernst & Young concluded that "strict construction of Notice 2016-36 dictates that the use of the safe harbor set forth in such notice is limited to transfers of property to a regulated public utility that

---

[49] *Id.* at 4 (emphasis added).

are then used by such utility to facilitate the transmission of electricity over the utility's transmission system."[50]

81.     Among other flaws, this analysis applied a superseded rule from a 1940 case in which the Supreme Court stated that "provisions that provide exemptions from taxation are to be strictly construed."[51]  More recent Supreme Court cases explain that in tax cases, exceptions from a general rule (which in this instance is the rule of 26 U.S.C. § 118(a) that contributions to capital are exempt from taxation) should be "narrowly applied" to further congressional purpose.  *Corn Prods. Ref. Co. v. C.I.R.*, 350 U.S. 46, 52 (1955); *see also Stiles v. Comm'r of Internal Revenue*, 69 T.C. 558, 562-63 (1978) (citing cases).

82.     Yet even in this result-oriented opinion, Ernst & Young was forced to concede that "it is possible a compelling position could be developed[]" in support of Plaintiffs' view that interconnection payments are not taxable income to National Grid.[52]  This concession is fatal as it acknowledges that a "reasonable basis" could be developed to not pay the tax.

### E.     State Public Utility Commissions and State Courts Are Unable to Resolve This Dispute

83.     In Rhode Island and in Massachusetts, independent generators have unsuccessfully challenged the tax gross-up in administrative proceedings before their respective public utility commissions.

84.     The question of whether National Grid could impose the charge at issue here was first raised in the Rhode Island proceeding referenced above, commenced in January 2014 by two

---

[50] Letter from National Grid Senior Counsel R.J. Webster to L.E. Massaro, Commission Clerk, Oct. 19, 2016, Attachment A, Ernst & Young Memorandum, Sept. 30, 2016, at 8 (RIPUC Dkt. No. 4483, Oct. 19, 2016), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-Response-WED-Objection(10-19-16).pdf.

[51] *Id.* at 6 (citation omitted).

[52] *Id.* at 8-9.

independent renewable generators.[53]  National Grid there argued first, that because RIPUC lacked jurisdiction to decide the federal tax question, it could only decide whether the charge was "reasonable," and not whether National Grid actually owed the tax, and second that the safe harbor applied only to transmission interconnections and not distribution interconnections.

85.     The parties agreed to try to settle the dispute by obtaining a PLR from the IRS, but the IRS declined to issue a PLR on the ground that it would soon issue guidance on the subject. On June 10, 2016, the IRS issued Notice 2016-36, which definitively resolved the question in favor of Plaintiffs.

86.     Nevertheless, contending that the Notice was still not clear on whether the safe harbor applies to distribution system interconnections, National Grid refused to refund the tax gross-up.

87.     Nearly three years later, on November 27, 2017, RIPUC issued a final Order.  While "noting that they do not sit as tax attorneys or tax experts," RIPUC nevertheless ruled that "the pass-through tax charges were reasonable in this proceeding."[54]

88.     On appeal to the Rhode Island Supreme Court, National Grid again argued that the Court could not make a binding ruling on whether or not the interconnection payments were income subject to federal taxation.

89.     During oral argument, both National Grid and RIPUC conceded that any purported uncertainty in the IRS guidance could be resolved if National Grid filed an administrative claim for a refund with the IRS.  Yet despite repeated requests, National Grid has refused to do so.

---

[53] Petition of Wind Energy Development, LLC & ACP Land, LLC for Dispute Resolution Relating to Interconnection with Narragansett Electric Company (RIPUC Dkt. No. 4483, Jan. 15, 2014), http://www.ripuc.ri.gov/eventsactions/docket/4483-WindEnergy-ACP-Petition_1-16-14.pdf.

[54] RIPUC Order No. 22957, at 21 (RIPUC Dkt. No. 4483, Nov. 27, 2017) http://www.ripuc.ri.gov/eventsactions/docket/4483-WED-NGrid-Ord22957_11-27-17.pdf.

90.    Over six years after ACP commenced its RIPUC proceeding, on June 1, 2020, the Rhode Island Supreme Court affirmed RIPUC's ruling.[55]   The Supreme Court declined to reach the merits of the tax question.  Deferring to RIPUC's conclusion that National Grid's passing on of the tax was "reasonable," it expressed its "fervent hope that the IRS will provide clear and concise guidance to these parties in the near future."[56]

91.    The issue of the legality of passing through an alleged federal tax on interconnection costs has also been raised by independent generators and advocates in Massachusetts, in a rate proceeding concerning another utility, Eversource.

92.    On January 5, 2018, the Massachusetts DPU issued an Order in which it declined to reach the merits of the interconnection tax issue, stating:

> [T]he Department determines that it would be appropriate to open a proceeding in the future to investigate the tax treatment of CIAC carrying charges as applied to the interconnection of distributed generation facilities, with the intent to set a uniform practice for all electric distribution companies.

Mass. D.P.U. Order No. 17-05-B, 2018 WL 369344, at *133 (Jan. 5, 2018).  However, the DPU did not open such a proceeding.

93.    National Grid continues to charge Plaintiffs for the tax gross-up on the cost of the transmission upgrades and annual operations and maintenance charges for those upgrades.

94.    National Grid's wrongful charge impedes the competitiveness of local renewable energy.

95.    Plaintiffs and the Plaintiff Class have no alternative but to pursue relief in this court.

---

[55] *ACP Land, LLC v. R.I. Pub. Utils. Comm'n*, 228 A.3d 328, 338 (R.I. 2020).

[56] *Id*. at 338.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT
### 28 U.S.C. § 2201(a)

96.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

97.     The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides, in relevant part, as follows:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

98.     Notwithstanding the apparent exclusion of controversies related to federal taxes, 28 U.S.C. § 2201(a) has been construed to allow declaratory judgments with respect to federal taxes where, as here, Plaintiffs are not the taxpayers, have no other remedy, and/or do not seek to enjoin the assessment or collection of any federal tax.  *See, e.g.*, *South Carolina v. Regan*, 465 U.S. 367, 378 (1984).

99.     The language, legislative purpose, and history of 26 U.S.C. § 118(b), and IRS Notices 88-129 and 2016-36, all make clear that the payments at issue here are not CIACs and are not taxable as income to National Grid.

100.     Because the income tax at issue is not a tax on Plaintiffs, but is only passed through to them, Plaintiffs cannot seek a refund pursuant to 26 USC § 7422(a).  National Grid has no incentive to seek a refund or take any action that might answer the question of whether the tax is owed—to the contrary, National Grid's interest is in passing the tax through and thereby raising the costs of Plaintiffs' interconnection.

101.     Nor can the New York State Public Service Commission or New York State courts

adjudicate whether National Grid owes the federal tax at issue.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

102.     Plaintiffs repeat and incorporate by reference the allegations contained in the

preceding paragraphs of this complaint, as if fully set forth herein.

103.     As the Federal Energy Regulatory Commission ("FERC") has stated:

> Interconnection is a critical component of . . . transmission service, and [having
> a] standard interconnection procedure[ ] and a standard agreement applicable to
> [generating facilities] . . . (1) limit[s] opportunities for Transmission Providers .
> . . to favor their own generation, (2) facilitate[s] market entry for generation
> competitors by reducing interconnection costs and time, and (3) encourage[s]
> needed investment in generator and transmission infrastructure.

FERC Order No. 2003, Dkt. No. RM02-1-000, 104 FERC ¶ 61,103, at ¶ 12 (2003).

104.     The New York State Public Service Commission has approved a Standardized

Contract for Interconnection of New Distributed Generation Units.  That Contract provides that

"the Utility shall design, construct and install the . . . [Dedicated] Facilities.  The . . . Customer

shall be responsible for paying the incremental capital cost of such [Dedicated] Facilities [in the

current version, "Interconnection Facilities"] attributable to the . . . Customer's Unit."[57]

"Dedicated Facilities" or "Interconnection Facilities" are defined as "the equipment and facilities

on the Utility's system necessary to permit operation of the Unit in parallel with the Utility's

system."[58]

---

[57] New York State Standardized Interconnection Requirements and Application Process.

For New Distributed Generators and Energy Storage Systems 5 MW or Less Connected in Parallel with Utility Distribution Systems, N.Y. Dept. of Pub. Serv., App. A § 3.6 (2021) https://www3.dps.ny.gov/W/PSCWeb.nsf/All/DCF68EFCA391AD6085257687006F396B?OpenDocument.

[58] *Id.*, App. A "Definitions."

105.    The relationship between Plaintiffs and National Grid, as parties to the SCIs, gave rise to an implied covenant that they would deal with one another in good faith and would not engage in any conduct to deprive the other of the benefits of that agreement.

106.    This implied obligation was particularly acute with respect to National Grid because it had unilateral authority under applicable tariffs and under the SCIs to:  (i) determine whether the independent renewable energy generators' interconnection payments were taxable income to National Grid; (ii) determine the amount of income tax it owed and the amount of the offset from depreciating the assets it obtained from Plaintiffs; and (iii) pass on and charge a tax gross-up to the independent renewable energy generators.

107.    In violation of the implied covenant of good faith and fair dealing, National Grid charged Plaintiffs for tax gross-ups despite the fact that their interconnection payments were not taxable to National Grid as income.

108.    Defendants further violated the implied covenant of good faith by:  (i) ignoring clear IRS guidance and the opinion of their own Director of U.S. Tax Research and Planning; and (ii) soliciting an opinion that was contrary to industry custom and practice and would support the result they sought in order to further their interest in increasing Plaintiffs' interconnection costs.

109.    Because of Defendants' knowing, intentional, and bad faith violations of the implied covenant of good faith and fair dealing, Plaintiffs have suffered substantial damages.

**COUNT III**

**RESTITUTION AND UNJUST ENRICHMENT**
**Restatement of the Law (3d), Restitution and Unjust Enrichment,**
**§§ 1, 5-6, 14, 19, 35, 64 *et al.***

110.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

111.    The Restatement (Third) of Restitution and Unjust Enrichment (2011) ("Restatement") § 1, Restitution and Unjust Enrichment, provides that "[a] person who is unjustly enriched at the expense of another is subject to liability in restitution."

112.    Restatement § 5, Invalidating Mistake, provides, in part, that "[a] transfer induced by invalidating mistake is subject to rescission and restitution."

113.    Restatement § 6, Payment of Money Not Due, provides that "[p]ayment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due."

114.    Restatement § 14, Duress, provides, in part, "(1) Duress is coercion that is wrongful as a matter of law.  (2) A transfer induced by duress is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment."  "[W]here the claimant, in response to pressure, has overpaid a subsisting obligation[], relatively modest pressure may be found to constitute duress if there is no other basis on which to order restitution."  Restatement § 14, Comment b.

115.    Restatement § 35, Performance of Disputed Obligation, provides:

> If one party to a contract demands from the other a performance that is not in fact due by the terms of their agreement, under circumstances making it reasonable to accede to the demand rather than to insist on an immediate test of the disputed obligation, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement.

The requirement of protest is satisfied when the recipient—here, National Grid—has notice that the entitlement in question is contested.  "Notice is adequate if the recipient is protected against unfair surprise."  Restatement § 35, Comment d.

116.    Restatement § 19 provides, in part:

> Except to the extent that a different rule is imposed by statute, the payment of tax by mistake, or the payment of a tax that is erroneously or illegally assessed or collected, gives the taxpayer a claim in restitution against the taxing authority as

necessary to prevent unjust enrichment. "Tax" within the meaning of this section includes every form of imposition or assessment collected under color of public authority.

A 1924 federal statute codified this proposition with respect to federal taxes, "whether or not such tax, penalty, or sum has been paid under protest or duress." 26 U.S.C. § 7422(b). The Restatement further explains:

> Restitution is allowed . . . for the same reasons that restitution is available in respect of a payment of money not due in a private transaction. Such a payment is involuntary on the part of the payor . . . in the legally meaningful sense that no one intends to pay a tax in excess of a liability that is both accurately and lawfully assessed. It is not the taxpayer's willingness to pay that is the relevant consideration, but whether the payment corresponds to a proper legal liability. To the extent it does not, the result is a transfer that lacks an adequate legal basis.

Restatement § 19, Comment c.

117.    Relatedly, pursuant to Restatement § 64, Passing on; Rights of Third Persons, where a party pays a tax that is not, in fact, owed, and passes that tax on to third parties, such as Plaintiffs here, those third parties have a claim in restitution against the payor of the tax, here National Grid.

118.    Under these rules, separately and/or jointly, National Grid owes restitution of all supposed taxes imposed by it on Plaintiffs.

## COUNT IV

### JUST AND REASONABLE CHARGES
### N.Y. Pub. Serv. L. § 65

119.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

120.    N.Y. Public Service Law § 65 provides, in relevant part, as follows:

> Every . . . electric corporation and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in

all respects just and reasonable.  All charges made or demanded by any such . . . electric corporation . . . for . . . electricity or any service rendered or to be rendered, shall be just and reasonable and not more than allowed by law or by order of the commission.  Every unjust or unreasonable charge made or demanded for gas, electricity or any such service, or in connection therewith, or in excess of that allowed by law or by the order of the commission is prohibited.

121.    The tax gross-ups at issue here are more than allowed by law and are therefore unjust and unreasonable.

122.    Therefore, they may not be charged to Plaintiffs or the Plaintiff Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against the Defendants as follows:

(1) A Declaration that payments for interconnection to National Grid's distribution system by independent generators of renewable energy who meet the criteria of the IRS safe harbor are not taxable as income to National Grid;

(2) An Order that Defendants cease charging a tax gross-up adder on renewable energy projects;

(3) An award to Plaintiffs and the Plaintiff Class of direct and consequential damages suffered by them and caused by Defendants' acts and omissions;

(4) In the alternative, an award to Plaintiffs and the Plaintiff Class of restitution of all sums wrongfully and/or erroneously paid in tax gross-ups to Defendants;

(5) An award to Plaintiffs for their reasonable attorneys' fees and costs; and

(6) Any other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all counts so triable.

Dated:  October 20, 2022

PLAINTIFFS,

By their Attorneys,

**KIRBY McINERNEY LLP**

/s/ Randy Fox
Randy Fox
David E. Kovel (*application for admission pending*)
John R. Low-Beer (*application for admission pending*)
Andrew M. McNeela (*application for admission pending*)
250 Park Avenue, Suite 820
New York, New York 10177
Tel: (212) 371-6600
Fax: (212) 751-2540
rfox@kmllp.com
dkovel@kmllp.com
jlowbeer@kmllp.com
amcneela@kmllp.com

**HANDY LAW LLC**

/s/ Seth H. Handy
Seth H. Handy (*pro hac vice admission forthcoming*)
42 Weybosset Street
Providence, RI 02903
Tel: (401) 626-4839
Fax: (401) 753-6306
seth@handylawllc.com